**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SANDRA MOODY, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | 3:13-cv-00575 (VAB) |
| v. | : | |
| | : | |
| AIRCASTLE ADVISOR, LLC, | : | MARCH 30, 2016 |
| | : | |
| Defendant. | : | |

**RULING ON DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Sandra Moody filed this action against her former employer, Aircastle Advisor, LLC

("Aircastle"), claiming (1) race discrimination in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), the Connecticut Unfair Employment Practices Act ("CFEPA"), and 42

U.S.C. § 1981(a); (2) sex (including pregnancy)[1] discrimination in violation of Title VII and

CFEPA; (3) retaliation in violation of Title VII and CFEPA; (4) hostile work environment in

violation of Title VII and CFEPA; and (5) a violation of the Family and Medical Leave Act

("FMLA").  Aircastle moves for summary judgment as to all claims.  For the reasons stated

herein, the motion is GRANTED.

## II.    FACTS[2]

---

[1] The Pregnancy Discrimination Act amended Title VII's definition of "because of sex" to include discrimination because of pregnancy, childbirth, or related medical conditions.  *Saks v. Franklin Covey Co.*, 316 F.3d 337, 343 (2d Cir. 2003) (citing 42 U.S.C. § 2000e(k)).  Accordingly, the Court interprets Moody's pregnancy discrimination claims as sex discrimination claims under Title VII and CFEPA.  *See Jamilik v. Yale Univ.*, 362 F. App'x 148, 150, 150 n.3 (2d Cir. 2009) (" . . . CFEPA claims are governed by the same standards applicable to Title VII claims.").

[2] The facts set forth herein are undisputed unless otherwise indicated.  The Court deemed admitted all properly-supported allegations in Aircastle's Local Rule 56(a)1 Statement that were not denied in Moody's Local Rule 56(a)2 Statement with specific citations to record evidence that actually contradicted the allegations.  *See* D. Conn. L. Civ. R. 56(a)3.  Moody's Local Rule 56(a)2 Statement does not comply with Local Rule 56(a)2, because it

Moody is an African-American female.  Pl.'s L.R. 56(a)2 Statement [hereinafter "Pl.'s Stmt."] ¶ 10, ECF No. 45.  Aircastle is a company that acquires, leases, and sells commercial jet aircraft to customers throughout the world.  *Id.* ¶ 1.

In 2005, Aircastle's chief executive officer, Ron Wainshal, interviewed Moody for an administrative assistant position.  *See id.* ¶¶ 11-12.  On June 30, 2005, Wainshal offered Moody the job.  *Id.* ¶ 12.  He knew that Moody was African-American.  *Id.*  Moody accepted, and started on July 8, 2005.  *Id.* ¶ 13.

Throughout her tenure at Aircastle, Moody's supervisor was Marie Gannon, who was the office manager at the Stamford, Connecticut office where Moody worked.  *Id.* ¶ 14.  Moody and Gannon were close friends who socialized outside of the office.  *See id.* ¶¶ 24, 68.[3]  Gannon talked to Moody about her family life, and sometimes spoke with Moody's children on the telephone and sent them letters.  *See id.* ¶ 25.[4]

Moody was pregnant five times during her tenure at Aircastle.  *See id.* ¶¶ 112, 114.  Two pregnancies resulted in miscarriages in the fall of 2006 and December 2010.  *Id.* ¶ 112.  Gannon was sympathetic for Moody's losses with respect to her 2006 miscarriage, and a miscarriage that pre-dated her tenure at Aircastle.  *See* Moody Dep. at 28.  Moody's other three pregnancies resulted in births in April 2006, January 2008, and July 2012.  *Id.* ¶ 114.  Aircastle threw a baby

---

does not contain "in a separate section titled 'Disputed Issues of Material Fact' a list of each issue of material fact as to which it is contended there is a genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)2.

[3] Denying this allegation in her Local Rule 56(a)2 Statement, Moody cited paragraph 22 of her declaration, which reads in part, "We were not close personal friends merely co-workers [*sic*]."  Moody Decl. ¶ 22.  Moody testified at her deposition, however, that she and Gannon were close and that she considered Gannon a friend.  Moody Dep. at 28:1-6, 70:21-24.  "It is beyond cavil that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony.'"  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).  Moreover, Moody admitted the allegation that "[p]rior to late fall 2010, Plaintiff and Gannon enjoyed a friendly relationship both at the office and outside of work.  They socialized with each other outside the office . . . ."  Pl.'s Stmt. ¶ 68.

[4] Moody denies these allegations in her Local Rule 56(a)2 Statement, but does not cite to record evidence that in fact contradicts them.  *See* Pl.'s Stmt. ¶ 25; Moody Decl. ¶ 23.

shower to celebrate the birth of Moody's first child, *id.* ¶ 115, and gave her gifts at the births of each of her children, *id.*; Moody Decl. ¶ 23.  Moody took twelve weeks of leave, without incident, following her April 2006 childbirth, and again following her January 2008 childbirth. Pl.'s Stmt. ¶ 116.

Aircastle's executive management team set Moody's compensation.[5]  *Id.* ¶ 26.  Each year, Moody received a compensation statement setting forth her base salary for the upcoming year and her cash bonus for the previous year.  *Id.*  From 2005 to 2007, Moody was an administrative assistant compensated as follows:

| Year | Base Salary | Bonus |
|------|-------------|-------|
| 2005 | $55,000 | $5,000 (prorated) |
| 2006 | $55,000 | $13,750 |
| 2007 | $57,750 | $14,400 |

*Id.* ¶ 27.

In late 2007, Aircastle hired a new chief financial officer, Michael Inglese, who brought along his executive assistant, Adriana Tournas, who is Caucasian.  *Id.* ¶ 30; Moody Decl. ¶ 11. Inglese supervised Tournas.  Pls.' Stmt. ¶ 30.  Tournas started with a base salary of $65,000, which was more than Moody's base salary at the time.  *See id.* ¶¶ 27, 30.  Moody brought this to Gannon's attention, and Aircastle promoted Moody to executive assistant and increased her salary to match Tournas's.  *Id.* ¶ 31.  From 2008 to 2012, Moody and Tournas were compensated as follows:

| Year | Moody's Base Salary; Bonus | Tournas's Base Salary; Bonus |
|------|----------------------------|------------------------------|
| 2008 | $65,000; $14,500 | $65,000; $14,500 |
| 2009 | $66,650; $14,500 | $66,650; $14,500 |
| 2010 | $66,650; $12,500 | $66,650; $14,500 |
| 2011 | $66,650; $10,500 | $66,650; $14,400 |
| 2012 | $66,650; $0 | $68,000; $14,500 |

---

[5] The parties dispute whether Gannon offered input as to Moody's compensation.  *See* Pl.'s Stmt. ¶ 26.

*Id.* ¶ 33.

During her tenure at Aircastle, Moody enrolled in an online undergraduate degree program. *Id.* ¶ 20.  Moody sometimes did schoolwork at work. *Id.* ¶ 21; Moody Dep. at 22-23. Moody received her undergraduate degree in November 2010. *Id.* ¶ 22.  In December 2010, Moody began an online master's degree program. *Id.* ¶ 23.  She obtained her master's degree in 2012. *Id.*

At the end of each year, Moody completed a self-appraisal of her performance for the year.  Gannon reviewed Moody's self-appraisals and drafted manager's appraisals. *Id.* ¶¶ 38-39. Gannon and Moody then met to discuss the appraisals. *Id.* ¶ 40.  Moody admits that Gannon's appraisals of her work for the years 2006, 2007, 2008, and 2009 were fair and not tainted with discriminatory or retaliatory animus. *Id.* ¶ 42.  Moody's appraisals for these years were generally positive. *See* Def.'s Exs. 18-21.

At the end of 2010, Moody submitted her self-appraisal for the year.  Pl.'s Stmt. ¶ 48.  It was essentially half-finished; Moody failed to set goals, provide feedback or suggestions about how to improve Aircastle, and request training or development opportunities.  This self-appraisal stood in contrast to Moody's prior self-appraisals, where Moody had included personal goals and feedback for Aircastle. *Id.* ¶ 49.

On January 16, 2011, Moody sent a letter to Wainshal and Lori Kleiman, Aircastle's human resources consultant.  Pl.'s Ex. A; Pl.'s Stmt. ¶ 3.  In the letter, Moody noted that the friendly relationship she had with Gannon began to change when she got her undergraduate degree.  Pl.'s Ex. A at 1.  The letter went on to complain about (1) Gannon telling Moody to inform someone when she takes her lunch break and is unable to answer the telephone; (2) a December 2010 incident where Gannon asked Moody why she would miss an office holiday

party following a miscarriage; (3) an incident where Gannon held Moody responsible for booking an unneeded car service reservation; and (4) an incident where Gannon got upset with Moody for not ensuring that a microwave was discarded promptly. *Id.* at 1-2. Moody did not include any complaints about disparate treatment on the basis of her race because, at the time, she did not believe that race was a factor in her treatment. Moody Dep. 71:5-16. Moody did not have any complaints about her treatment that she did not include in the January 16, 2011 letter. *Id.* at 76:19-25. It was the first time that Moody had ever complained to anyone at Aircastle. Pl.'s Stmt. ¶ 70. Wainshal asked Kleiman to address Moody's concerns, and she did. *Id.* ¶ 78.

Moody believed, and asserts in this action, that Gannon's attitude toward her and treatment of her changed because she got a degree. *See id.* ¶¶ 74-76. The change in their relationship began before Moody's miscarriage in December 2010. *Id.* ¶ 75. Moody's 2006 and 2008 childbirths had not affected Moody's relationship with Gannon; they had continued to be friendly. *Id.* ¶ 117.

In February 2011, Gannon and Moody signed Moody's 2010 manager appraisal.[6] Def.'s Ex. 31 at AYR000161. It noted that Moody's work was "generally satisfactory," but that she should take more initiative, improve communication with her manager, follow through with assignments until their completion in a timely manner, not do schoolwork in the office, and keep personal telephone calls to a minimum. *Id.* The appraisal mentioned the microwave incident, and made a goal for Moody to identify and resolve issues that arose on her projects. *Id.* Moody prepared a rebuttal contesting some of the negative marks. *Id.* at AYR000164-66. Gannon, Moody, and Kleiman met in February 2011 to discuss Moody's appraisal. Pl.'s Stmt. ¶ 57;

---

[6] The parties dispute when Gannon finished drafting Moody's 2010 appraisal. *See* Pl.'s Stmt. ¶¶ 50-51, 77. Moody claims that Gannon revised it after learning about Moody's letter to Wainshal. *See* Moody Decl. ¶ 15. Aircastle claims that Gannon did not see that letter before completing Moody's appraisal. Pl.'s Stmt. ¶¶ 58, 77.

Moody Decl. ¶ 12.  At that meeting, Moody learned that her bonus for the year would be $2,000 less than her previous bonus.  Moody Decl. ¶ 12.

On April 14, 2011, Moody filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that Aircastle gave her a poor appraisal, reduced her bonus, and retaliated against her because of her race and because of her letter to Wainshal.  Pls.' Stmt. ¶ 79, 81-82; Def.'s Ex. 35.

On October 19, 2011, Moody sent Wainshal another letter complaining that her work environment was "hostile," that she was reprimanded for making an unneeded travel reservation, and noting that the purpose of the letter was to "bring [Wainshal] up to speed about one of the many nitpicky things that have been going on behind the scenes."  Def.'s Ex. 36.  The letter does not assert that the alleged hostility was because of Moody's race, sex, or pregnancy.  *Id.*  Moody admits that, with respect to the travel reservation incident, Gannon did not say anything to her other than to explain the reasoning behind Aircastle's policy to not book travel over the weekend.  Pl.'s Stmt. ¶ 89.  Gannon did not see Moody's second letter to Wainshal until after the filing of this lawsuit.  *Id.* ¶ 90.[7]

In November 2011, upon the CHRO's recommendation, Aircastle engaged a relationship coach to help Moody and Gannon with their relationship.  *Id.* ¶¶ 92-97.  Moody and Gannon met with the coach individually, but never jointly.  *Id.*

Aircastle's receptionist was charged with answering the main telephone line within the first two rings.  If the receptionist was away from her desk and the phone rang more than twice, Moody or Tournas were supposed to answer – Moody in the morning, Tournas in the afternoon. Moody often left her desk without notifying anyone, which resulted in Tournas having to answer

---

[7] In denying this assertion, Moody cites two paragraphs of her declaration concerning unrelated events that predate the October 19, 2011 letter.  *See* Pl.'s Stmt. ¶ 90.

the telephone when Moody should have been available to answer. Moody also failed to answer Wainshal's phone. The receptionist reported this issue to Gannon, and it became the subject of meetings of the administrative staff. *Id.* ¶¶ 45, 46; Eyler Dep. at 13. Moody proposed having the receptionist advise Moody and Tournas if she needed to leave her desk. Pl.'s Stmt. ¶ 47. Gannon did not approve this proposal. *See id.*; Eyler Dep. at 14.

In November or December 2011, Gannon drafted Moody's 2011 appraisal. Pl.'s Stmt. ¶ 59. It was worse than her 2010 appraisal. It noted that Moody's "performance has declined since her most recent job review" and reiterated that she must follow through with assignments and be more proactive around the office. It concluded that Moody had accomplished only two of her seven goals from her previous appraisal, *id.* ¶ 60, and that Moody "does not normally complete projects in a timely manner and rarely follows up to make sure manager [*sic*] is informed" and "continues to have communication issues with her Manager, including showing a lack of respect[,]" Def.'s Ex. 32 at AYR000151. Finally, it noted that Moody's "lack of respect towards her supervisor is disruptive to Aircastle" and that she "is not providing value to the administrative team and must immediately change her work habit as described herein for continued employment." *Id.* at AYR000152. Moody prepared a rebuttal contesting some of the negative comments. *Id.* at AYR000154-56.

Throughout 2012, several employees complained to Gannon about Moody. Gannon Dep. at 41-42. In 2012, "people just stayed away from [Moody]. She didn't look up. She rarely said hello. People just stayed away from her. She was not very friendly." Pl.'s Stmt. ¶ 62. During the last two years of her tenure at Aircastle, Moody was defensive, unapproachable, and insubordinate in her dealings with Gannon. Nevertheless, Gannon attempted to speak with Moody to understand her negative attitude. Moody countered with more unpleasantness and

disrespect.  Moody refused to look at Gannon when Gannon spoke, and Moody spoke disrespectfully to Gannon.  *Id.* ¶ 67.

Prior to January 2012, Aircastle had separate vacation leave and sick leave policies.  *Id.* ¶ 98.  Effective January 1, 2012, Aircastle combined its vacation leave and sick leave policies into a single Paid Time Off ("PTO") policy under which employees would accrue PTO throughout the year to be used for absences due to illness or vacation.  *Id.* ¶ 100.

Under the policy, Moody was entitled to 23 PTO days in 2012, which would accrue at a rate of 1.92 days per month.[8]  *Id.* ¶ 101.  The policy provided that "PTO may be used in minimum increments of one-half day (4 hours) except for exceptional circumstances and with prior approval of your direct supervisor."  Def.'s Ex. 37 at AYR003024.  The policy did not explicitly permit employees to "go negative" (*i.e.*, to take PTO that they had not yet accrued).  *See id.* at ARY003022-24.  Nonetheless, to allow Moody to receive prenatal care, Aircastle permitted her to "go negative" shortly after the policy went into effect.  Moody constantly exceeded her allotment of PTO.  Pl.'s Stmt. ¶ 104.

In April 2012, Aircastle formally amended the PTO policy to allow employees in good standing to "go negative" up to five days at the discretion of their supervisors.  *Id.* ¶ 108.  The policy provided that once an employee had "gone negative" five days, the employee could not take any additional PTO until the employee had accrued enough to return to a zero balance.  Def.'s Ex. 37 at AYR003029.

---

[8] Moody claims she was "shorted" three PTO days in 2012.  Moody Decl. ¶ 71.D.  In support, however, she cites an August 2012 e-mail exchange where she asked human resources to "apply 3 of my PTO days so that my pay cycle will go through the 14th of September[.]"  The response indicated that Moody's September 14 paycheck would include "3 PTO days [at] 100% of her daily rate" for "9/12 – 9/13 – 9/14[.]"  The remainder of the exchange concerns Moody's belief, based on her memory of her experiences before Aircastle instituted its PTO policy, that she was entitled to full compensation for all 12 weeks of her FMLA leave.  Pl.'s Ex. DD.

On January 5, 2012, Moody requested a half-day of PTO to leave work at 11:30 A.M. so that she could attend a 2:00 P.M. doctor's appointment.  Because her shift began at 8:00 A.M., she would only have worked three-and-one-half hours if she left at 11:30 A.M.  Pl.'s Stmt. ¶ 120.  As noted above, the PTO policy provided that "PTO may be used in minimum increments of one-half day (4 hours) except for exceptional circumstances and with prior approval of your direct supervisor."  Def.'s Ex. 37 at AYR003024.  Gannon explained to Moody that she had to work until 12:00 P.M. in order to use a half day of PTO; alternatively, she could use a full day of PTO.  Pl.'s Stmt. ¶ 120.  Moody offered to start work early to make up the time, but Gannon declined on the ground that Aircastle did not need an executive assistant in the early morning.  *Id.* ¶ 122.  In March 2012, Tournas was allowed to work only two-and-one-half hours, take only a half PTO day, and make up the hours on a later date.  *See* Moody Decl. ¶ 40; Pl.'s Ex. N.

On January 17, 2012, Moody e-mailed Gannon stating that she was going to take a full PTO day because her car would not start.  Pl.'s Stmt. ¶ 124.  On January 23, 2012, Moody e-mailed Gannon stating that she was not coming to work because she was not feeling well.  *Id.* ¶ 25.  The next day, Moody again e-mailed Gannon stating that she was not coming to work because she was not feeling well.  *Id.* ¶ 126.

By February 15, 2012, Moody had exhausted all of her accrued PTO, and had "gone negative" nearly five days of unearned PTO, which Gannon had allowed her to take.  Lori Kleiman, Aircastle's human resources consultant, informed Moody that Aircastle could not approve unlimited days off, even if they were unpaid, and that Aircastle "need[ed] [Moody] to be in the office to perform a function on a regular basis."  *Id.* ¶ 127; Def.'s Ex. 43.  Kleiman also advised Moody of her right to take intermittent leave for her doctor's appointments, and that she would receive the necessary FMLA paperwork to seek approval for such leave.  FMLA-

approved absences would not count against her, but any future absences that did not qualify for FMLA leave would be unapproved.  Pl.'s Stmt. ¶ 128.

On February 22, 2012, Moody's physician certified that Plaintiff required routine antepartum and postpartum care.  *Id.* ¶ 130.  Kleiman e-mailed Moody on March 1, 2012 to advise her that she was approved for intermittent FMLA leave for one prenatal doctor's visit per month, as requested by her physician.  The e-mail stated that, if Moody took any intermittent leave before the birth of her child, it would be deducted from her twelve weeks of FMLA leave.  But Aircastle ultimately elected not to deduct Moody's intermittent leave from her twelve weeks of FMLA leave, and instead granted Moody a full twelve weeks of FMLA leave beginning after her last day of work before giving birth, allowing her to exceed the twelve weeks of unpaid leave required under the FMLA.  *Id.* ¶ 131.  However, Kleiman advised Moody that Aircastle would not approve future non-FMLA-qualifying absences, which would be unpaid until Moody became eligible for PTO under the policy.  *Id.* ¶ 132.

Kleiman attached to her e-mail a Performance Improvement Plan ("PIP"), dated February 29, 2012.  Moody signed the PIP on March 1, 2012.  *Id.* ¶ 134.  It noted that Kleiman and Moody had discussed the fact that Moody's absences were excessive and a concern to Aircastle, and that Moody had been told to submit an FMLA application if she believed her absences related to a serious health condition.  Otherwise, her time off would be considered unauthorized.  *Id.* ¶ 135.  As a result of this PIP, Moody was no longer in good standing under the PTO policy.  *Id.* ¶ 136.

Moody missed work on April 11, 12, and 13.  On April 16, Moody submitted a note from her general physician indicating that she had been under the physician's care since April 11 and could return to work on April 16.  Because the physician's note did not appear to relate to Plaintiff's approved intermittent FMLA leave for prenatal appointments, Aircastle determined

that the absences would be unapproved unless they pertained to a separate serious medical condition covered by the FMLA.  *Id.* ¶ 137.

By letter dated April 16, Kleiman advised Moody that her absences for April 11, 12, and 13 were unapproved and would be unpaid because Moody had already exhausted her accrued PTO.  In fact, she had "gone negative" five days.  The letter also stated that the doctor's note that Moody had submitted did not provide sufficient information for Aircastle to determine why she was absent and unable to work, another reason why her absences were unapproved and unpaid. Kleiman advised Moody, however, that if the absences were related to a serious medical condition, she could apply for concurrent FMLA leave – in which case the absences would no longer be unapproved – by submitting the appropriate paperwork by no later than April 30, 2012. Moody never did so.  *Id.* ¶ 138.  Kleiman also warned Moody that her continued absences were creating a hardship for Aircastle's administrative team, and that future absences, except for FMLA or other approved leave, would be unauthorized and unpaid until Plaintiff accrued sufficient PTO to return to a zero balance.  Thereafter, any PTO that would cause Moody to "go negative" would be approved or not at Gannon's discretion.  *Id.* ¶ 139.

On April 20, 2012, Moody frequently left her desk to use the restroom and was unavailable to answer the phone.  *Id.* ¶ 140.  Gannon e-mailed her to inquire if she was alright. Gannon then notified Kleiman that Moody had left her work area at least four times that day for approximately 30 minutes or more each time.  *Id.*

On May 8, 2012, Moody filed another complaint with the CHRO alleging discrimination, harassment, retaliation, and delegation of difficult assignments because of her sex, pregnancy, and previously opposing discrimination.  *See id.* ¶ 42; Def.'s Ex. 37.  She also alleged that she was assigned to move large, heavy binders.  *Id.*

11

Aircastle had several hundred binders that were not needed on-site.  Aircastle decided that the paper in the binders would be sent to storage, but the binders themselves would be kept on-site to reuse.  *Id.* ¶ 144.  In 2011, before Moody was pregnant, Gannon assigned her to move the binders.  *Id.* ¶ 143; Moody Decl. ¶ 43.  In January 2012, when Moody was pregnant, Gannon assigned Moody to remove the paper from the binders, which were standing upright on a table.  Pl.'s Stmt. ¶ 147.  She did not ask Moody to lift the heavy binders, only to empty their contents.  *Id.*  At Moody's request, a receptionist helped her set up the binders so that she could remove their contents.  *Id.* ¶ 150.  Throughout the process, Moody put binders on the floor, which bothered some of her colleagues.  *See id.* ¶ 152-53.  Emptying the binders was an uncomfortable task for Moody because it required her to bend, which caused pressure on her bladder because her baby was resting low in her abdomen.  Moody Decl. ¶ 44.

Kristin O'Neill, a Caucasian female, was Aircastle's Director of Contract Management.  Pl.'s Stmt. ¶ 105.  She reported to Aircastle's chief operating officer and general counsel, and was responsible for managing the contracts group and all of Aircastle's leasing activities.  *Id.*  Aircastle did not require O'Neill to complete FMLA paperwork in order to attend prenatal doctor's appointments, but did require Moody to do so.  Pl.'s Stmt. ¶ 107.  O'Neill's last day of work before maternity leave was January 4, 2012.  *Id.* ¶ 174.  She initially asked to take fifteen weeks of leave, but ultimately took less because she could not afford to go the extra time without compensation.  *Id.*  O'Neill was allowed to "go negative" in March 2012.  *Id.* ¶ 107.

In June 2012, Aircastle began preparing for Moody's imminent maternity leave.  By letter dated June 19, 2012, Aircastle's payroll specialist notified Moody that she was entitled to twelve weeks of FMLA leave and was expected to return to work on September 24, 2012.  *Id.* ¶ 155.  Except for a seven-day waiting period imposed by Aircastle's short term disability policy,

Moody would be paid her base salary during the first eight weeks of her leave.  *Id.* ¶ 157.

On or about June 19, 2012, Moody met with the payroll specialist and Blaire Milanese, Aircastle's Senior Vice President of Human Resources.  *Id.* ¶ 159.  Moody was presented with a disability leave calendar, which she reviewed and signed.  It indicated that Moody's maternity leave would begin on June 28, 2012 and that she would return to work on September 24, 2012.  The portion of her leave beyond eight weeks – from September 5 to September 21 – would be unpaid unless Moody chose to apply accrued PTO.  *Id.* ¶¶ 160-62.

On June 27, Moody wrote a letter to Milanese requesting that her short term disability benefits begin on July 2.  *Id.* ¶ 163.  Milanese responded by letter dated July 5, 2012, explaining that, based on Moody's physician's certificate, Moody's period of incapacity ran from June 29 through September 21, and that Aircastle had granted her FLMA leave for that twelve-week period.  *Id.* ¶ 164.  Milanese also explained that Aircastle could not commence Plaintiff's short term disability benefits on July 2, because the policy mandated a seven-day waiting period.  Accordingly, the only way for Moody to be paid during the waiting period would be for her to use accrued PTO, but Plaintiff did not have any accrued PTO at that time.  As a result, Plaintiff would not be paid for June 29, July 2, 3 and 5.  She would be paid for the July 4th holiday, however.  *Id.* ¶ 165.  Milanese further explained that Aircastle's policy was to cover six to eight weeks recovery post-birth at 100% of an employee's base salary.  Notwithstanding, Aircastle allowed Moody to begin her eight-week period at 100% of her salary pre-birth, immediately after the expiration of the waiting period on July 5.  Milanese noted that Moody's eight-week period at 100% of her salary would end on August 31st.  *Id.* ¶ 167.

Moody gave birth in July 2012.  *Id.* ¶ 168.  Aircastle sent Moody a gift basket to congratulate her.  *Id.* ¶ 169.

On August 21, 2012, Moody e-mailed the payroll specialist to say that her short term disability would end on September 11 and to request three PTO days so that she would be paid through September 14.  Moody also complained that she would not receive 100% of her base salary after August 31.  *Id.* ¶ 170.  Milanese responded on August 23rd and confirmed that Aircastle would apply three of Moody's PTO days on September 12th, 13th and 14th.  Milanese also reminded Moody that Aircastle's policy had always been to pay an employee at 100% of base salary for the first six to eight weeks of short term disability leave.  After six to eight weeks, continued short term disability leave, if approved by Aircastle's insurance carrier, was paid at only 70% of base salary.  *Id.* ¶ 171.  Moody responded that she had been paid at 100% for longer than eight weeks during her maternity leave in 2008.  *Id.* ¶ 172.  Milanese responded that Aircastle's PTO policy had changed since Moody's maternity leave in 2008 to eliminate unlimited sick time, and further noted that she reviewed Moody's 2008 short term disability calendar and confirmed that Moody was paid at 100% for only eight weeks, not more, as she claimed.  *Id.* ¶ 173; Def.'s Ex. 65.

When Moody returned to work on September 24, 2012, she had exhausted her twelve weeks of FMLA leave.  Moody took full PTO days on October 3 and 8,[9] and a half day on October 31.[10]  Pl.'s Stmt. ¶¶ 190-91, 193.

Once a year, Aircastle hosts a few days of off-site meetings, typically in New York City. Employee attendance is mandatory.  *Id.* ¶ 180.  The purpose of the off-site meetings is partly to discuss business and partly for employees to meet in person – not through video conference –

---

[9] Moody notes that this was Columbus Day, but she states that she took a PTO day, and does not cite any evidence showing that Aircastle employees were not expected to work that day.  Pl.'s Stmt. ¶ 191.  Aircastle submitted an e-mail sent by Moody on this date stating, "I am not feeling well this morning I will not be in the office."  Def.'s Ex. 42 at 000254.

[10] Aircastle claims that Moody also missed work on October 18, but cites to an e-mail dated October 8, 2012.  *See* Def.'s Stmt. ¶ 192.

and spend time together and do team-building.  *Id.* ¶ 181.  On September 26, 2012, Gannon announced that the 2012 off-site would be held in New York City, beginning with a dinner on the evening of November 7th and ending in the early afternoon on November 9th.  Gannon noted that attendance was mandatory.  *Id.* ¶ 182.

On October 23, 2012, Moody, who was breastfeeding, e-mailed Milanese and Aircastle's chief operating officer and general counsel stating, "I have a new infant at home which I am currently nursing and as such I will not be able to attend the offsite since it is too long of a separation period from the baby with such commute.  However, I can still be in the office to conduct my daily duties."  *Id.* ¶ 184.  Milanese responded and asked Moody to come to her office to discuss.  Milanese told Moody that she could skip the dinner on November 7th and that she did not have to stay overnight in New York City.[11]  Moody was only expected to attend the meetings on November 8th and 9th.  The off-site meetings were scheduled to end no later than noon on November 9th.  Milanese advised Moody that she would not be permitted to work from the office on November 8th and 9th because the office would be empty and Aircastle did not need her to be there.  *Id.* ¶ 185.  Aircastle hired a temporary worker to cover office duties during the off-site meetings.  Moody Decl. ¶ 66.

On the morning of November 9th, Moody e-mailed Milanese and Gannon stating, "Not making it to the city at the doctor's [*sic*]."  Milanese responded that attendance at the off-site was mandatory and requested that Moody provide a doctor's note for her absence.  Moody provided two doctor's notes, but Aircastle did not excuse Moody's November 9th absence on the ground that she had exhausted all of her PTO and FMLA leave.  Pl.'s Stmt. ¶¶ 187-88.

---

[11] Moody denies this allegation, but does not cite record evidence that actually supports her denial.  *See* Pl.'s Stmt. ¶ 185.

On November 15, 2012, Milanese issued Moody a second PIP.  Milanese and Moody met to discuss the PIP and Moody's performance issues.  Milanese warned that, unless Moody improved her performance, Aircastle would take more serious disciplinary measures.  *Id.* ¶ 198. The PIP noted that Moody's performance fell short of expectations in four areas (attention to detail, performance goals, attendance, and communication), and provided examples of failures in each area.  Def.'s Ex. 75 at AYR002263- 64.  It set forth corrective actions, including that "[a]ll PTO is cleared in advance; if your PTO banks is negative, your PTO will not be approved and if taken will be unpaid[,]" and that "communication with your supervisor and others will improve dramatically both in emails and in-person conversations.  Your current overall attitude is unsatisfactory."  *Id.* at AYR002265.

The next day, Moody missed work, claiming "I am not feeling well this morning I will not be in the office."  Def.'s Ex. 42 at AYR004858.  Thereafter, her communication, attendance, and attention to detail did not improve, and she failed to set any goals for herself in her 2012 appraisal.[12]  Pl.'s Stmt. ¶ 200.  During her 2012 appraisal meeting, Milanese asked Moody several times if she had any questions or if she had anything to say about her performance issues. Moody's only response was "nope, nope."  *Id.* ¶ 201.

Moody missed half day of work on November 20, 2012.  *Id.* ¶ 202.  She missed a half day on December 5.  Def.'s Ex. 76 at AYR 005661.15.  She missed a full day on December 18. Pl.'s Stmt. ¶ 204.

On January 14, 2013, after consulting with Gannon and Aircastle's executive management team, Milanese met with Moody and Gannon and told Moody that her employment was being terminated.  Wainshal approved the decision to terminate Moody's employment.

---

[12] Moody denies this allegation, but does not cite to record evidence that actually controverts it.  *See* Pl.'s Stmt. ¶ 200.

Wainshal Decl. ¶ 12.  Gannon advised Moody that her performance had not improved since the second PIP was issued and that, as a result, that day would be her last at Aircastle.  Pl.'s Stmt. ¶ 227.  Plaintiff's final payment of wages was dated January 14, 2013.  She received her regular wages, plus payment for accrued and unused PTO.  *Id.* ¶ 228.

## III.   STANDARD OF REVIEW

The Court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has carried that initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If no reasonable jury could find in favor of the opposing party because "the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).

Summary judgment may be appropriate "even in the fact-intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

However, "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Thus, "[a] trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue," and "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224 (citations omitted). But "the mere incantation of intent and state of mind" does not "operate as a talisman to defeat an otherwise valid motion." *Meiri*, 759 F.2d at 998. Thus, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

## IV.    DISCUSSION

### A.    Disparate Treatment on the Basis of Race, Sex, and Pregnancy

Moody asserts race and sex (including pregnancy) discrimination under Title VII and CFEPA, and asserts race discrimination under 42 U.S.C. § 1981(a). The same analysis applies to all claims: the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Sanchez v. Conn. Nat. Gas Co.*, 421 F. App'x 33, 34 n.2 (2d Cir. 2011) ("Although *McDonnell Douglas* concerned the burden and allocation of proof under Title VII, its framework is also applied to claims under 42 U.S.C. § 1981 . . . and the CFEPA").

To overcome a motion for summary judgment under the *McDonnell Douglas* framework, "a plaintiff must first satisfy an initial burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45

(2d Cir. 2015) (internal quotation marks omitted).  Establishment of the prima facie case creates a presumption that the employer unlawfully discriminated against the employee, thus placing upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993) (internal quotation marks omitted).

"If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143.  Although the evidentiary burden shifts back and forth, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Hicks*, 509 U.S. at 518.

### 1.     Prima Facie Case

To satisfy her prima facie burden, Moody must show that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  "[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is '*de minimus*.'"  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995).

### a.    Protected Class

Moody belongs to protected classes because of her African-American race, female sex, and pregnancy.  *E.g.*, *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 252 (2d Cir. 2014) (African-American is protected class); *Sweeney v. Research Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir. 1983) (female is protected class); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) (pregnant is protected class).

### b.    Qualified for the Position

The Court assumes without deciding that Moody satisfied her *de minimus* burden to show that she was qualified for her position.

### c.    Adverse Employment Action

Moody's filings do not identify her claimed adverse employment actions with any specificity.  Liberally construed, they suggest that she claims as adverse employment actions her reduced bonuses, negative appraisals, and termination.[13]  Moody's termination is an adverse employment action, and the Court assumes without deciding that Moody's negative appraisals and reduced bonuses are as well.  *See Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) ("[N]egative evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination.") (internal quotation marks and citation omitted); *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) (district court

---

[13] Moody's filings do not claim excessive scrutiny as an adverse employment action.  Even if they had, the Court would not conclude that the scrutiny Moody claims to have been under amounted to an adverse employment action in this case.  *See, e.g.*, *Ortiz v. Metro. Transp. Auth.*, 615 F. App'x 702, 704 (2d Cir. 2015) (district court properly held that claimed excessive scrutiny did not qualify as an adverse employment action); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) (excessive scrutiny from supervisors and requiring documentation for sick leave did not support Title VII retaliation claim) (citing *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) and *Bernheim v. Litt*, 79 F.3d 318, 327 (2d Cir. 1996)); *Guglietta v. Meredith Corp.*, 301 F. Supp. 2d 209, 216 (D. Conn. 2004) ("[C]ourts within the Second Circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions.") (internal quotation marks and citation omitted).

erred in ruling that denial or reduction of bonus could not constitute adverse employment action solely because employer had discretion whether to pay a bonus).

#### d.    Inference of Discrimination

The Court also assumes without deciding that Moody satisfied her burden to raise an inference of discrimination.

### 2.    Legitimate, Nondiscriminatory Reason

At the second step of the *McDonnell Douglas* inquiry, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Hicks*, 509 U.S. 507. Aircastle has met its burden by "clearly set[ting] forth, through the introduction of admissible evidence," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), its reason for taking adverse action against Moody: her performance and attendance issues.

### 3.    Pretext

Moody has not carried her burden at the third step of the *McDonnell Douglas* inquiry, which requires her to show that the legitimate reasons offered by the defendant were pretext for discrimination.

First, Moody has not raised a genuine dispute as to whether Aircastle's stated reasons for taking adverse employment actions are "unworthy of credence[.]" *See Reeves*, 530 U.S. at 147. That is, she has not shown that she did not have performance and attendance issues. Moody admits that she constantly exceeded her allotment of PTO, Pl.'s Stmt. ¶ 104, was placed on two PIPs because of her attendance and performance issues, *id.* ¶¶ 134-36, 198; Def.'s Ex. 75, failed to complete self-appraisals, Pl.'s Stmt. ¶¶ 49, 200, and, during the last two years of her tenure, was not friendly or approachable, *id.* ¶ 62, and was defensive, insubordinate, and disrespectful in her dealings with Gannon, *id.* ¶ 67. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.

1997) (where record established that plaintiff arriving at work late, failed to submit paperwork on time, and had inadequate written and oral communication, plaintiff's rationalizations for performance deficiencies did not establish pretext); *Taylor v. Polygram Records*, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. 1999) ("[F]aulting others for, or otherwise rationalizing, problems legitimately perceived by [plaintiff's] employer does not establish pretext.") (citing *McLee*, 109 F.3d at 135).

Of course, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination . . . ." *Reeves*, 530 U.S. at 147. Moody may meet her burden at this stage by demonstrating that a discriminatory reason more likely than not motivated Aircastle's adverse employment actions against her. *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 155-57 (2d Cir. 2010) (plaintiff not required to prove that employer's stated justification was false, but must establish that defendant was motivated at least in part by discrimination). However, because Aircastle's "stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination is substantial." *Lucibello v. Yale-New Haven Hosp.*, No. 03-cv-814, 2005 WL 578324, at *7 (D. Conn. Mar. 10, 2005).

As to sex (including pregnancy) discrimination, Moody's own allegations undermine her claim. She alleges that Aircastle treated O'Neill more favorably by allowing her to attend prenatal doctor's appointments without completing FMLA paperwork, and by authorizing her to take fifteen weeks of leave. Pl.'s Stmt. ¶ 107; Moody Decl. ¶ 71.D. Moody's allegation that a pregnant employee received more favorable treatment undermines any inference that Aircastle was motivated by anti-pregnancy animus. *See Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (affirming district court's grant of summary judgment as to Title VII

pregnancy discrimination claim where plaintiff alleged more favorable treatment of another pregnant employee).

Further, Moody admits that her 2006 and 2008 childbirths did not affect her friendly relationship with Gannon, Pl.'s Stmt. ¶ 117, and that Gannon was sympathetic for her losses with respect to her 2006 miscarriage and another miscarriage that pre-dated her tenure at Aircastle, *see* Moody Dep. at 28.  Moody initially claimed that Gannon's hostility began because she got a degree, and seems to stand by that claim in this litigation, *see* Pl.'s Stmt. ¶ 74 (admitting allegation that relationship change "was the result" of academic degree), but simultaneously claims that Gannon's alleged hostility, beginning after years of friendship and support, was because of her sex and/or pregnancy.  Similarly, Moody admits that her appraisals for 2006, 2007, 2008, and 2009, during which time she had multiple pregnancies, were not tainted with discriminatory animus, *id.* ¶ 42, and does not claim that her pay was discriminatory before her bonus reduction in early 2011, but claims that the same persons responsible for those appraisals and pay determinations (Gannon and Wainshal) began discriminating against her on the basis of sex with respect to appraisals and compensation in early 2011.  Moody does not offer evidence lending any credibility to this turnaround, and has not otherwise raised a genuine dispute as to whether Aircastle's actions were motivated by sex discrimination.[14]

As to race discrimination, Moody offers no evidence of derogatory racial remarks, and instead compares her treatment to that of two Caucasian colleagues: O'Neill and Tournas.  A plaintiff may raise an inference of discrimination when the employer treats the plaintiff less favorably than an employee who is "similarly situated" "in all material respects" and "outside [her] protected group."  *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

---

[14] The Court concludes, for the reasons stated herein, that Moody has not raised a genuine dispute as to whether Aircastle violated the CFEPA provision providing particular protections for pregnant employees.  *See* Conn. Gen. Stat. § 46a-60(a)(7).

Moody notes that Aircastle allowed O'Neill to attend prenatal doctor's appointments without completing FMLA paperwork, and authorized her to take fifteen weeks of FMLA leave. Neither alleged event relates to any of Moody's claimed adverse employment actions. Also, Moody does not allege that she asked for, and was denied, more than twelve weeks of FMLA leave, and therefore the second point does not show disparate treatment.

Furthermore, Moody has not shown that O'Neill was similarly situated in all material respects. In *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997), the Second Circuit determined that the plaintiff's co-workers were not similarly situated in all material respects because, *inter alia*, they had different supervisors and the plaintiff did not show that they had engaged in comparable misconduct. *Accord Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (plaintiff must show that comparator engaged in comparable conduct). Plaintiff has not shown that she and O'Neill were similarly situated with respect to job position and responsibilities, nor with respect to conduct. O'Neill was Aircastle's Director of Contract Management responsible for Aircastle's leasing activities, she sometimes worked from home, and she reported to Aircastle's chief operating officer and general counsel, Pl.'s Stmt. ¶¶ 105, 213-14, whereas Moody was an executive assistant and reported to Gannon. Moreover, Moody had attendance issues leading up to her placement on a PIP shortly after O'Neill took maternity leave, and Moody offers no evidence that O'Neill had similar issues at or about the time that she attended prenatal doctor's appointments.

As to Tournas, Moody notes that Tournas was allowed to take a half PTO day when she worked fewer than four hours and make up the time later, and that Tournas's bonuses were not reduced. But Tournas was not similarly situated in all material respects, either. While it is clear that Moody's bonuses declined and Tournas's held steady, Moody's declining bonuses coincided

24

with her performance and attendance issues resulting in negative appraisals and PIPs.  Moody offered no evidence that Tournas had similar disciplinary issues.  *See, e.g.*, *Stefanidis v. Jos. A. Bank Clothiers, Inc.*, No. 3:14-cv-00971 (VAB), 2016 WL 845297, at *9 (D. Conn. Mar. 2, 2016) (co-worker with dissimilar disciplinary record was not similarly situated in all material respects); *Padilla v. Harris*, 285 F. Supp. 2d 263, 270-71 (D. Conn. 2003) (granting summary judgment in favor of defendant because possible comparator had "fundamentally different" disciplinary record, and noting that "[p]rior disciplinary problems may be sufficient to justify differential treatment of otherwise similarly situated employees"); *Moore v. Capital Region Workforce Dev. Bd.*, 359 F. Supp. 2d 133, 138 (D. Conn. 2005) (granting summary judgment in favor of employer that discharged African-American administrative assistant for poor work performance where plaintiff failed to show that proposed comparators had similar job responsibilities and disciplinary records).  Moreover, Aircastle promptly increased Moody's compensation to meet Tournas's when she joined Aircastle.  Pl.'s Stmt. ¶ 31.  With regard to Aircastle's allowing Tournas to take a half PTO day and make up the hours later, Moody offers no evidence suggesting that this was race-based favoritism, and, again, Tournas was not similarly situated because she reported to a different supervisor, and there is no evidence that Tournas had absenteeism issues.

Finally, as noted above, Moody's own admissions undercut her claims of discrimination.  Moody admitted that her experience at Aircastle was untainted by discrimination until late 2010, and even testified at her deposition that she had no basis for believing that her race was a factor in her first bonus reduction.  *See* Moody Dep. at 69-70.  Moody claims that Gannon became hostile toward her because she got a degree, but at the same time speculates that Gannon, after years of close friendship and positive appraisals, became hostile toward her because she is black.

In sum, Moody has not shown that Aircastle's proffered reasons for taking adverse action against her are unworthy of credence, and has not otherwise raised a genuine dispute that Aircastle was motivated by discrimination.

### B.    Retaliation

The Court analyzes Title VII retaliation claims under the *McDonnell Douglas* framework. *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015).  To make out a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* at 315-16. "Even if a plaintiff sets forth a prima facie case, however, this establishes only a rebuttable presumption of retaliation, and where the defendant identifies a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's articulated reason is a pretext for retaliation." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011).

With respect to Title VII claims, the plaintiff must "demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's protected activity was a but-for cause of the alleged adverse action by the employer." *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 93-94 (2d Cir. 2014) (internal quotation marks and citations omitted); *accord Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (Title VII retaliation claims "must be proved according to traditional principles of but-for causation").  Connecticut courts have not yet adopted *Nassar*'s but-for causation standard for retaliation claims under CFEPA, and therefore CFEPA retaliation claims may remain subject to a less-demanding "motivating factor" analysis. *See Tremalio v. Demand Shoes, LLC*, No. 3:12-cv-00357, 2013

WL 5445258, at *21 (D. Conn. Sept. 30, 2013).  The distinction does not matter in this case,

however, because Moody has not raised a genuine dispute of material fact under either standard.

### 1.    Prima Facie Case

#### a.    Protected Activity

An employee's complaint may constitute protected activity so long as the employee had a

good faith, reasonable belief that she was opposing an employment practice prohibited by Title

VII.  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir.

2013).  Neither of Moody's letters to Wainshal constituted protected activity.  Both letters were

generalized complaints that did not claim disparate treatment on the basis of any trait protected

under Title VII.  *See* Def.'s Exs. 34, 36.  No reasonable jury could conclude that, with either

letter, Moody had a good faith, reasonable belief that she was opposing unlawful discrimination.

Moody's CHRO complaints filed on April 14, 2011 and May 8, 2012 did constitute

protected activity.  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (formal

charges of discrimination constitute protected activity).

#### b.    Defendant's Knowledge of Protected Activity

Aircastle knew of Moody's CHRO complaints against it.  *See Kessler v. Westchester Cty.*

*Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (noting that only general corporate

knowledge of protected activity is required, and holding that defendant knew of complaint filed

against it with the New York State Division of Human Rights).

#### c.    Adverse Employment Action

Moody's termination constituted an adverse employment action.  As above, the Court

assumes without deciding that her bonus reductions and negative appraisals did as well.  But

adverse employment actions predating protected activity do not support retaliation claims.

*McAllister v. Queens Borough Pub. Library*, 309 F. App'x 457, 459 (2d Cir. 2009) (plaintiff failed to state a claim for retaliation because adverse employment action occurred before his protected activity).  Therefore, Moody's bonus reductions and negative appraisals predating April 14, 2011 do not support her claim.

### d.       Causal Connection

Moody has failed to establish a causal connection between her protected activity and the subsequent adverse employment actions that she suffered.

Aircastle terminated Moody nearly twenty-one months after her first CCHRO complaint, and over eight months after her second.  Given this lapse of time, and Moody's performance and attendance issues, no reasonable jury could infer that her protected activity caused her termination.  *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (twenty months between protected activity and adverse action suggests "no causality at all."); *Figueroa v. Weisenfreund*, 255 F. App'x. 595, 597 (2d Cir. 2007) (no prima facie causal connection where fifteen months separated complaints and termination); *Farina v. Branford Bd. of Educ.*, No. 3:09-cv-00049 (JCH), 2010 WL 3829160, at *8 (D. Conn. Sept. 23, 2010) (no causal connection where seven months separated filing of CHRO complaint and plaintiff's termination), *aff'd*, 458 F. App'x 13 (2d Cir. 2011).

Moody also fails to provide sufficient evidence of a causal connection between her protected activity and her negative appraisals and bonus reductions.  Moody's memorandum focuses principally on her argument, which the Court rejects, that her first letter to Wainshal was protected activity.  *See* Pl.'s Mem. at 27-28.  She also argues that she was "constantly harassed" throughout her final two years at Aircastle, but in support of that proposition cites paragraphs of her declaration merely showing that Wainshal did not respond to her unprotected letter, that

Aircastle arranged for her and Gannon to meet with a relationship coach, and that she filed a second CHRO complaint. *See id.* at 28. In any event, she claims that the alleged harassment began before her protected activity, and as a result of her degree and her unprotected letter to Wainshal. *See* Moody Decl. ¶¶ 8, 18, 19; Pl.'s Stmt. ¶ 74. She again points to O'Neill's not having to complete FMLA paperwork to attend prenatal doctor's appointments, but, as discussed *supra*, Moody has not shown that O'Neill was similarly situated, and, in any event, Moody fails to offer any evidence connecting this dissimilar treatment to her first CHRO complaint, which she filed approximately six months before.

The only remaining basis for finding a causal connection is temporal proximity, which cannot establish a causal connection in this case because the adverse employment actions, beginning in February 2011, were part of an extended period of progressive discipline which commenced before Moody's protected activity in April 2011. *See, e.g.*, *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no inference of retaliation where "adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline' which began" five months before filing discrimination charge; "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise"); *Bernard v. JP Morgan Chase Bank NA*, 408 F. App'x 465, 469 (2d Cir. 2011) (where plaintiff relied only on temporal proximity, district court properly granted defendant's motion for summary judgment as to retaliation claim where plaintiff's supervisors gave her verbal and written warnings before protected activity; "[s]ince [defendant]'s adverse employment actions against [plaintiff] began several months before [plaintiff] engaged in any potentially protected activity, [plaintiff] cannot demonstrate a causal connection between them.") (citing *Slattery*, 248

F.3d at 95); *Nicastro v. N.Y.C. Dep't of Design & Const.*, 125 F. App'x 357, 358 (2d Cir. 2005)
(no prima facie inference of retaliation where "[plaintiff] was subject to adverse employment
actions well before he engaged in protected activity, and his demotion and salary reduction
occurred almost ten months after this activity.").

Finally, even if Moody had established a prima facie case, the Court concludes, for the
reasons discussed *supra* at Part IV.A.3, and because temporal proximity alone cannot establish
pretext, *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), that Moody has failed
to offer sufficient evidence to raise a genuine dispute as to whether Aircastle's legitimate,
non-retaliatory reasons were pretext.

## C.      Hostile Work Environment

Moody's hostile work environment claim fails because no reasonable jury could conclude
that Aircastle subjected Moody to conduct that was severe or pervasive enough to create an
objectively hostile work environment because of a protected trait.

Title VII[15] makes it "an unlawful employment practice for an employer . . . to
discriminate against any individual with respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's race, color, religion, sex, or national
origin." 42 U.S.C. § 2000e-2(a)(1). The phrase "terms, conditions, or privileges of
employment" strikes at the entire spectrum of disparate treatment in the workplace, including
requiring people to work in a discriminatorily hostile environment. *Harris v. Forklift Sys., Inc.*,
510 U.S. 17, 21 (1993). Accordingly, Title VII is violated when "the workplace is permeated
with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to

---

[15] The same standards govern Moody's hostile work environment claims under CFEPA and Title VII. *Martinez v. Conn., State Library*, 817 F. Supp. 2d 28, 55 (D. Conn. 2011) ("The standards governing . . . hostile work environment under CFEPA are the same as those governing Title VII."); *see also Craine v. Trinity Coll.*, 791 A.2d 518, 531 n.6 (Conn. 2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.").

alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation marks omitted).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.*  In evaluating severity or pervasiveness, the Court must look at all of the circumstances, and may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.  As to frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002). "[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive." *Id.* at 374.  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*  However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.*

Moody's memorandum makes vague references to "derogatory" and "[d]iscriminatory" comments without explaining what they were or who made them.  *See* Pl.'s Mem. at 6, 15, 20, 21, 27, 28.  She references Gannon's querying why Moody could not attend an office holiday party following a miscarriage, and references an e-mail, not addressed to Moody, where female co-workers accused Moody of faking contraction pains so that she could skip work.  *Id.*  Moody also points to having her bonus reduced, getting poor appraisals, receiving scrutiny for taking time off to go to doctor's appointments, being assigned to remove papers from binders while pregnant, being asked to go to an off-site meeting in New York City, and not being excused for her absence from the off-site meeting.  *See id.* at 29-31.

Title VII is not a "general civility code for the American workplace," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), and this Court is not a "super personnel department[.]" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001). The Court must apply the standards for judging hostility to "filter out complaints attacking the ordinary tribulations of the workplace . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

Moody's vague allegations of "derogatory" remarks amount to nothing more than "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct" which are not sufficiently severe or pervasive to create a hostile work environment. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004). The remainder of Moody's allegations – that she was disciplined and scrutinized for her performance and attendance, and that she was required to empty binders and attend a meeting in New York – amount to ordinary workplace tribulations that, while perhaps inconvenient and offensive to Ms. Moody, do not provide a basis for a reasonable jury to find an objectively hostile work environment. *See, e.g.*, *Graciani v. Patients Med., P.C.*, No. 13-CV-2751 (NGG) (RLM), 2015 WL 5139199, at *21 (E.D.N.Y. Sept. 1, 2015) (conduct not sufficiently severe or pervasive where pregnant plaintiff was required to run errands and lift heavy boxes on three occasions, received "evil looks" and "nasty" responses from colleague, was told to cover her stomach and wear bigger clothes, and was followed to restroom); *Gratton v. Jetblue Airways*, No. 04 Civ. 7561 (DLC), 2005 WL 1251786, at *9 (S.D.N.Y. May 25, 2005) (dismissing hostile work environment claim based on allegations that pregnant plaintiff's supervisors required her to provide doctor's notes explaining her limitations while pregnant, and reprimanded her for complaining about supervisor's treatment of her); *Anderson v. State of N.Y., Office of Court Admin. of Unified Court Sys.*, 614 F. Supp. 2d 404, 424

(S.D.N.Y. 2009) (granting summary judgment as to hostile work environment claim based on plaintiff's being accused of not following instructions, receiving negative performance evaluation, and being subjected to an unwarranted counseling session; such conduct was not severe or pervasive), *aff'd sub nom.*, *Anderson v. Cahill*, 417 F. App'x 92 (2d Cir. 2011).

Furthermore, for the reasons discussed *supra*, the Court concludes that Moody has not raised a genuine dispute that her alleged hostile treatment was because of her race, sex, or pregnancy. *See Oncale*, 523 U.S. at 80 (Title VII is directed only at discrimination based upon the categories protected by Title VII); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (plaintiff must demonstrate that "she was subjected to hostility because of her membership in a protected class"). Moody's own filings maintain that the alleged hostile conduct began as a result of Gannon learning that Moody was pursuing a degree and had written an unprotected letter to Wainshal. *See, e.g.*, Pl.'s Stmt. ¶ 74-76; Moody Decl. ¶¶ 8, 18. This alleged conduct followed years of close friendship between Moody and Gannon, during which Gannon supported Moody through pregnancies and miscarriages, and during which Moody received years of appraisals that, she admits, were untainted by discrimination. Pl.'s Stmt. ¶¶ 24, 42, 68; Moody Dep. at 28. Even drawing all reasonable inferences in her favor, no reasonable jury could conclude that Moody was subjected to allegedly hostile conduct because of her race, sex, or pregnancy.

### D. FMLA Claim

The Second Circuit has recognized two types of FMLA claims: interference and retaliation. *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011) (citing *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004)). Moody's claim is neither.

Moody complains that Aircastle did not give her proper notice before instituting its PTO policy, that she was required to complete FMLA paperwork in order to attend prenatal doctor's appointments whereas a Caucasian colleague was not, and that Aircastle's PTO policy violates public policy because it discriminates against pregnant women.  Moody has not alleged or briefed interference or retaliation under the FMLA.  To the extent that her filings can be construed to assert an interference claim,[16] the Court concludes that no genuine dispute exists as to whether Aircastle interfered with Moody's rights under the FMLA.

To prevail on a claim of interference under the FMLA, a plaintiff must establish that (1) she is an eligible employee under the FMLA; (2) the defendant is an employer as defined by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she gave notice to the defendant of her intention to take leave; and (5) she was denied benefits to which she was entitled under the FMLA.  *Graziadio v. Culinary Inst. of Am.*, --- F.3d ---, No. 15-888-CV, 2016 WL 1055742, at *6 (2d Cir. Mar. 17, 2016).

Moody has not raised a genuine dispute as to whether Aircastle denied her FMLA benefits.  Moody received her full twelve weeks of leave.  In fact, Aircastle elected not to deduct Moody's intermittent prenatal leave from her twelve weeks of FMLA leave, and instead granted Moody a full twelve weeks beginning after her last day of work before giving birth, allowing her to exceed the twelve weeks of unpaid leave required under the FMLA.  Pl.'s Stmt. ¶ 131.  *E.g.*, *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999) (affirming district court's dismissal of interference claim because plaintiff received the twelve weeks of leave to which he was entitled); *Stuart v. T-Mobile USA, Inc.*, No. 14-CV-4252 (JMF), 2015 WL

---

[16] Moody's filings plainly do not assert a retaliation claim under the FMLA.  *See* Pl.'s Mem. at 27-28, 32-33; Compl. ¶ 21.  Even if they could be construed to assert such a claim, the Court concludes, for the reasons discussed herein, that Moody has not raised a genuine dispute as to whether "the adverse employment action[s] occurred under circumstances giving rise to an inference of retaliatory intent," *Potenza*, 365 F.3d at 168, nor has she raised a genuine dispute as to pretext.

4760184, at *4 (S.D.N.Y. Aug. 12, 2015) (granting employer's motion for summary judgment as to interference claim where "there [was] no evidence that [plaintiff] was denied a benefit to which she was entitled under the FMLA . . . . In fact, [defendant] went above and beyond its obligations under the Act and provided [plaintiff] with additional leave beyond the twelve workweeks to which she was entitled.").

**V.      CONCLUSION**

For the foregoing reasons, Aircastle's Motion for Summary Judgment (ECF No. 30) is GRANTED.  The Clerk is directed to enter judgment in Aircastle's favor and close this case.


SO ORDERED at Bridgeport, Connecticut this thirtieth day of March, 2016.


  /s/ Victor A. Bolden_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE